UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LEONARD THOMAS, <br><br> Plaintiff, <br><br> v. <br><br> JACK HENDRIX, et al., <br><br> Defendants. | CAUSE NO.: 3:18-CV-752-JD-MGG |

OPINION AND ORDER

Leonard Thomas, a prisoner without a lawyer, filed a motion for a preliminary injunction for a transfer to a facility with a specialized mental health unit. He currently proceeds on a First Amendment claim of retaliation and an Eighth Amendment claim of deliberate indifference for his transfer from the New Castle Correctional Facility to the Westville Control Unit in March 2017 and on an Eighth Amendment claim of deliberate indifference for failing to prevent him from attempting suicide in March 2018.

"The purpose of preliminary injunctive relief is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir.1998). "In order to obtain a preliminary injunction, the moving party must show that: (1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm

the public interest." *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 619 (7th Cir. 2004). Additionally,

> "[t]he PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right. This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage."

*Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012).

## FACTS

In support of the instant motion, Thomas submitted his medical records from January 2016 through November 2018, and, according to these medical records, the following occurred. On January 30, 2016, Thomas was placed on suicide watch at the Westville Control Unit after threatening to cut his wrist if he did not receive a twenty-five hundred calorie diet. ECF 11-4 at 5-6. On April 7, Thomas voiced suicidal intent and cut his wrists because his food tray was delivered late. ECF 11-5 at 105-08.

On April 20, 2016, he transferred to the New Castle Correctional Facility. *Id.* at 190-93. On intake, he told Dr. Keris that "he had recently claimed suicide in order to be removed from his current housing situation and that he did not really want to die," and Dr. Keris noted that he had a history of engaging in acts of self-harm to manipulate his housing assignments. *Id.* at 202-06. In reviewing his mental health records, Dr. Keris noted that Thomas frequently complained of anxiety and hallucinations but medical staff rarely observed any sign of these symptoms. *Id.* His diagnoses included antisocial

2

personality disorder and paranoid schizophrenia, and his psychotropic medications included Risperdal. *Id.* On April 29, he underwent an initial psychiatric evaluation, and Dr. Burdine noted that he had been sent to the Westville Control Unit because he had attempted to murder his cellmate. *Id.* at 213-23. She further noted that Thomas had shown few objective signs of schizophrenia. *Id.* She planned to discontinue his psychotropic medication to allow for a baseline observation for diagnostic purposes. *Id.*

On June 28, 2016, Dr. Burdine observed no changes as a result of the discontinuing his medication. ECF 11-6 at 56-59. On July 14, mental health staff discussed Thomas' treatment plan and concluded that he should not have been transferred to New Castle Correctional Facility based on his stable mental condition even without medication. *Id.* at 68-69. However, they noted his behavioral issues, which included episodes of intense anger when he did not get his way. *Id.* On August 25, a mental health therapist noted that Thomas had been refusing to attend group therapy and refused to discuss a new treatment plan. *Id.* at 102-03. She opined that Thomas' mental condition did not warrant a paranoid schizophrenia diagnosis because Thomas had been stable without medication for four months with no signs of psychosis. *Id.*

On October 6, 2016, mental health staff discussed Thomas's treatment plan and noted his refusal to attend individual and group therapy sessions. *Id.* at 146-48. They observed that Thomas would alternate between insisting that he was seriously mentally ill and asserting that there was nothing wrong with him based on which position was more advantageous to him at any given time. *Id.* They found that he had made no progress during the last ninety days. *Id.* They also noted that he had shown no signs of

psychosis after six months without psychotropic medication. Id Based on these observations, they recommended a transfer to another facility. *Id.* On October 11, 2016, Dr. Keris noted that Thomas exhibited no signs of psychosis or of responding to internal stimuli after six months without psychotropic medication. *Id.* at 155-58. She described him as very organized and logical but manipulative and impulsive with a tendency to believe that others are working against him. *Id.* Based on these observations, she replaced the diagnosis of paranoid schizophrenia with borderline personality disorder. *Id.* On December 29, 2016, mental health staff noted no signs of psychosis after nine months without psychotropic medication. ECF 11-7 at 9-11.

On March 7, 2017, Thomas transferred to the Westville Control Unit, and mental health staff determined that Thomas did not meet the criteria for an inmate with a serious mental illness. *Id.* at 76-82, 95-96. On March 8, Thomas began complaining on a daily basis through medical requests and in person that he heard voices instructing him to engage in self harm. *See e.g.,* ECF 1-7 at 18-40; ECF 1-8; ECF 1-9. From April 1, 2017, to January 18, 2018, Dr. Eichmann responded by restarting Thomas on psychotropic medication and increasing the dosage on five separate occasions. ECF 11-7 at 126-28, 149-51, 169-71; ECF 11-8 at 5-8, 45-48, 81-84. He also received weekly visits from mental health staff as well as individual therapy sessions on a monthly basis. *See e.g.,* ECF 11-7 at 154, 166, 172-74, 187, 199-201. On December 19, 2017, a mental health therapist noted that Thomas had been placed on a razor restriction after stating that he wanted to cut his wrists with a razor. ECF 11-8 at 70-72.

On March 12, 2018, Thomas cut his wrists with a razor found in the shower and reported that he did so due to voices instructing him to engage in self harm. *Id.* at 109-10. He was moved to an observation unit and was placed on constant suicide monitoring. *Id.* at 111-12. A mental health therapist noted that there were no signs that Thomas had experienced hallucinatory commands other than his report and that he had asked her about a new housing assignment. *Id.* at 113-16. She assessed a high likelihood that Thomas engaged in this act of self-harm to manipulate his housing assignment. *Id.* On March 13, Thomas reported that he was no longer suicidal and that he was ready to be released from suicide observation. *Id.* at 122-24. He was stepped down from constant observation to close observation. *Id.* On March 14, Thomas had no complaints, and he was removed from suicide observation. *Id.* at 130-31. Mental health staff continued to monitor Thomas as a suicide risk until April 11. *Id.* at 141-71.

On May 8, 2018, Dr. Eichman planned to wean Thomas from psychotropic medication to clarify his diagnosis, and she lowered his dosage of Haldol. *Id.* at 186-89. On May 17, a mental health therapist observed no mental health symptoms. *Id.* at 200-01. On May 30, a mental health therapist noted complaints of visual hallucinations but observed that these complaints were inconsistent with Thomas' demeanor and behavior. ECF 11-9 at 11-12. In June and July 2018, Dr. Eichman continued to wean Thomas from psychotropic medication, noting that he remained asymptomatic. *Id.* at 21-24, 54-56. On August 21, Dr. Eichman discontinued Thomas' psychotropic medication and noted no observed signs of mood disorder or psychosis since she began to wean him. *Id.* at 112-13. On September 18, Thomas refused to attend a scheduled

appointment with Dr. Eichman. *Id.* at 157-58. On September 21, Thomas reported the inability to sleep, racing thoughts, a lack of focus, and hearing voices. *Id.* at 169-70. A mental health therapist found these reports inconsistent with his ability to hold a rational conversation, perform legal work, and his well-rested appearance. *Id.* On September 25, Thomas went to the law library instead of attending a scheduled appointment with Dr. Eichman. *Id.* at 174-75.

On September 27, 2018, Thomas cut his left wrist with a razor. *Id.* at 186-87. He was moved to an observation unit and was placed on constant suicide monitoring, where he continued to report suicidal intent. *Id.* at 188-90. On October 4, he denied suicidal intent and asked to restart psychotropic medication. ECF 11-10 at 31-34. He was stepped down from constant observation to close observation. *Id.* On October 8, he was released from suicide watch. *Id.* at 54-56. On October 15, Thomas reported no mental health issues and denied thoughts of self-harm. *Id.* at 74-75. A mental health therapist observed him joking and laughing. *Id.* On October 22, Thomas reported paranoia, anxiety, the inability to sleep, and passing thoughts of self-harm. *Id.* at 90-91. A mental health therapist observed that he did not present as anxious but joked and laughed during the therapy session. *Id.* On October 24, Thomas reported that he did not have coping skills. *Id.* at 103-04. When a mental health therapist raised Thomas' earlier reports of coping by reading and exercising, Thomas said that he did not remember that. *Id.* The therapist observed Thomas' extensive legal work and ability to keep his room clean and orderly. *Id.* She further noted Thomas' inability to elaborate on his continuous reports of paranoia and hearing voices and that Thomas never

demonstrated these symptoms in the presence of mental health staff. *Id.* Mental health staff continued to monitor Thomas as a suicide risk until November 5. *Id.* at 118-19.

On November 6, 2018, Thomas was unable to elaborate on his reported mental health symptoms. *Id.* at 121-22. A mental health therapist observed that Thomas' reported symptoms remained constant regardless of his prescribed dosages of psychotropic medication. *Id.* She also observed Thomas diligently working in the law library with a pleasant demeanor with no signs of depression or hearing voices. *Id.* She concluded that his reports were an attempt to manipulate others for personal gain. *Id.* On November 13, Thomas refused to discuss his mental health treatment plan with Dr. Eichman, but she observed no signs of psychosis or major mood disorder. *Id.* at 136-38. On the same day, Thomas also refused to discuss his mental health symptoms with a mental health therapist. *Id.* at 139-40. On November 19, a mental health therapist observed that "[Thomas] does not like to be questioned on his symptoms and constantly only reports the exact same things over and over again." *Id.* at 143-44. She further observed that he continued to function with no significant concerns. *Id.* She noted that Thomas conveniently never had suicidal thoughts when approached by mental health staff despite reporting that they occurred two to three times per day. *Id.*

## DISCUSSION

To obtain a preliminary injunction, Thomas must show that he has a reasonable likelihood of success on the merits. To establish liability for an Eighth Amendment claim of deliberate indifference, a prisoner must satisfy both an objective and subjective component by showing: (1) his medical need was objectively serious; and (2) the

7

defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "To prevail on his First Amendment retaliation claim, [a plaintiff] must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012).

Thomas asserts that his transfer in March 2017 from the specialized mental health unit at the New Castle Correctional Facility to the Westville Control Unit where he is held in administrative segregation constituted deliberate indifference as well as an act of retaliation for grievances and lawsuits filed in connection with his medical care. The record reflects that, during his time at the New Castle Correctional Facility, Thomas refused to participate in therapy as instructed and made no progress. Mental health staff met with Thomas on a regular basis but noted that he exhibited no signs of psychosis after nearly one year without psychotropic medication. Dr. Keris assessed Thomas' mental condition, including the absence of significant mental health symptoms, and determined that he did not have paranoid schizophrenia. Thomas also had a history of engaging in self-harm to manipulate his housing assignment. Based on these factors, the mental health staff at the New Castle Correctional Facility recommended that Thomas be transferred to another facility. The record thus indicates that Thomas' transfer resulted from the defendants' sound medical judgment rather than deliberate indifference or a desire to retaliate against Thomas for engaging in First

Amendment activity. As a result, the court cannot conclude that Thomas is reasonable likely to succeed on the merits of his claims regarding his transfer to the Westville Control Unit.

Thomas asserts that the failure to prevent him from attempting suicide in the Westville Control Unit in March 2018 constituted an act of deliberate indifference. The record reflects that Thomas returned to the Westville Control Unit with no diagnosis of paranoid schizophrenia and was not classified as an inmate with a serious mental illness. Nevertheless, mental health staff met with Thomas on a regular basis and responded to his uncorroborated reports of hearing voices that instructed him to engage in self-harm by prescribing and increasing the dosages of psychotropic medication and by restricting his access to a razor. Following the incident, mental health staff moved Thomas to an observation unit and placed him on suicide watch. Thomas reported that the suicidal thoughts ceased the following day, but he remained fixated on his housing assignment. Mental health staff thus assessed that the act of self-harm was an attempt to manipulate his housing assignment, but they continued to monitor Thomas as a suicide risk during the following month. In sum, the record reflects that mental health staff did not act with deliberate indifference but instead treated Thomas' mental condition in accordance with their medical judgment. Consequently, the court cannot conclude that Thomas is reasonably likely to succeed on the merits of his claim regarding the failure to prevent him from attempting suicide in March 2018.

The court must also consider whether Thomas has demonstrated that he will suffer irreparable harm unless he is transferred to a facility with a specialized mental

health unit. Notably, neither Thomas' arguments nor his exhibits offer any insight into Thomas' mental health, housing conditions, or medical treatment since November 2018. Further, the medical records from New Castle Correctional Facility strongly indicate that Thomas is not a suitable candidate for a specialized mental health unit due to his lack of significant mental health symptoms and his refusal to participate. Moreover, though Thomas engaged in self-harm in September 2018, the record reflects that it closely resembled the March 2018 incident. While Thomas complained of mental health symptoms, mental health staff observed no objective signs of these symptoms but instead noted behavior that conflicted with his complaints, including exercising, reading, joking, laughing, extensive legal work, a well-rested demeanor, and a tidy cell. Mental health staff also observed no change in Thomas' behavior after the discontinuation of psychotropic medication. Moreover, Thomas repeatedly refused to meet with his psychiatrist and mental health therapists or to elaborate on his symptoms, thereby depriving mental health staff of the opportunity to assess and verify his mental condition, which, in turn, makes it more difficult for the court to credit his allegations. Therefore, the court finds that Thomas has not demonstrated irreparable harm.

Additionally, with respect to the competing and public interests, unnecessary intrusions into the management of prisons are generally disfavored. *See* 18 U.S.C. § 3626(a) (prison-related injunctions must be necessary to remedy the violation and narrowly tailored); *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) ("Prison officials have broad administrative and discretionary authority over the institutions they

manage."). In conclusion, the court has considered the relevant factors and finds that Thomas is not entitled to a preliminary injunction.

As a final matter, Thomas has filed a motion to clarify his service obligations. In the screening order, the court advised Thomas, who does not proceed in forma pauperis in this case, that he was responsible for arranging service of process on the forty-two named defendants. ECF 6. In that order, the court informed Thomas that he could ask the United States Marshals Service to effectuate service for a fee of $378.84. Regrettably, this fee amount was incorrect, and the Marshals Service has since notified Thomas that he must pay an additional $629.16 for service.[1] ECF 13. If Thomas cannot afford this service fee, he may need to consider other options, including filing a motion for leave to proceed in forma pauperis with his prison account ledgers for the last six months.

The court further observes that the screening order was issued nearly eight months ago. According to the Federal Rules of Civil Procedures.

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). Though Thomas' confusion to this point was understandable, it has now been resolved. As such, the court will now set a deadline for Thomas to either satisfy his service obligations or to file a motion for leave to proceed in forma pauperis.

---

[1] This means that total fee for service in this case is $1008.00. While the total fee may seem high, it amounts to only twenty-four dollars per defendant.

11

For these reasons, the court:

(1) DENIES the motion for a preliminary injunction (ECF 11);

(2) GRANTS the motion to clarify (ECF 17);

(3) GRANTS Leonard Thomas until <u>August 15, 2019</u>, to notify the court that he has paid the service fee to the United States Marshals Service, to file a motion for leave to proceed in forma pauperis with his prison account ledgers for the last six months, or to otherwise resolve his service obligations; and

(4) CAUTIONS Leonard Thomas that, if he does not respond by this deadline, this case will be dismissed without further notice.

SO ORDERED on July 17, 2019

/s/ JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT